# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | |
|---|---|
| GREGORY J. LACH and ) | |
| CONNIE R. LACH, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | NO. 2:08-CV-251 |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## **OPINION AND ORDER**

This matter is before the Court on the Rule 12(b)(1) Motion to Dismiss, filed by Defendant, the United States of America, on October 28, 2008. For the reasons set forth below, the motion is **DENIED**.

BACKGROUND

Defendant, the United States of America, moves to dismiss the complaint of Plaintiffs, Gregory and Connie Lach ("the Lachs"), pursuant to Federal Rule of Civil Procedure 12(b)(1). Plaintiffs have brought this action "to quiet title to certain real property" owned by the United States and managed by the National Parks Service as part of the Indiana Dunes National Lakeshore. (Compl. at ¶ 1.) The action is brought pursuant to 28 U.S.C. section 2904a. (Compl. at ¶ 1.)

Plaintiffs became the owners of the property and residence located at 5525 Stagecoach Road, Portage, Indiana, on November 22, 2006. (Compl. at ¶ 8; Affidavit of Gregory J. Lach (hereinafter "Lach Aff.") at ¶ 1.) The property upon which the Lachs built their residence was acquired from Charles Ewen (Gregory Lach's father in law) when it was subdivided from a 35.17 acre parcel owned by Ewen. (Compl. at ¶¶ 9, 10; Lach Aff. at ¶ 2; Affidavit of Charles Ewen (hereinafter "Ewen Aff.") at ¶¶ 1, 8.) Ewen and his wife acquired title to the 35.17 acres on April 29, 1994. (Compl. at ¶ 11; Ewen Aff. at ¶ 1.)

Prior to April 29, 1994, the 35.17 acres was owned by Marijo Driggs, Wilma Gustafson, Melody Gustafson a/k/a Melody Gustafson Antonini, Carolyn Nicholson Weinstein West, Larry Lee Gustafson, and Karen E. Fischer (hereinafter "six owners"). (Compl. at ¶ 12; Ewen Aff. at ¶ 2.) Beginning in the 1940s and continuing until April 29, 1994, the six owners and their predecessors rented their property to Ewen and his family for purposes of farming and maintaining the 35.17 acres, and the Ewens did farm the 35.17 parcel. (Compl. at ¶ 13; Ewen Aff. at ¶ 3.)

Specifically, Ewen says that "[w]hile farming and maintaining the 35.17 acres, from the 1940s until at least 2005, we also farmed and maintained all of the land from the 35.17 acres *up to the southern edge of Stagecoach Road*." (Ewen Aff. at ¶ 7 (emphasis added).) During that whole time period, Ewen claims his family and

2

he "used this land to access Stagecoach Road at various points." *Id.* Additionally, over the years Ewen and his father farmed and maintained the 35.17 acres, and before Stagecoach Road was paved, they would also grade Stagecoach Road. (*Id.* at ¶ 5.)

To the north of the 35.17 acre parcel was land owned by Inland Steel Company. (Compl. ¶ 17.) A private road known as Stagecoach Road ran through the southern portion of this Inland Steel Property. Since January 13, 1978, the National Parks Service ("NPS") has been the owner of this real property, referred to by the NPS as Tract 09-102. (Compl. at ¶ 15.) This deed was recorded in the records of the Recorder of Porter County, Indiana, on January 17, 1978. (Ex. 2 to Mem. In Supp. Of Mot. To Dismiss.) Tract 09-102 is located directly to the north of and adjoining to the real property owned by the Lachs (5525 Stagecoach Road) and north of the real property owned by the Ewens (35.17 acres). (Compl. ¶ 16.)

In 1981, a surveying firm contracted by the NPS, Wightman & Associates, surveyed the boundary between Tract 09-102 and the 35.17 parcel . (*See* Affidavit of John Kamer, "Kamer Aff.," at 1.) According to John Kamer, a survey employer who participated in the survey, some monuments marking the property boundary were already in place at the time of the survey, and they also placed additional concrete monuments to identify corners of the Park property, and wood stakes around the entire perimeter of the land surveyed. (*Id.*

at 2.) Ewen never saw any 2 inch by 2 inch wooden stakes along Stagecoach Road and the 35.17 acre parcel. (Ewen Aff. at ¶ 10.) Prior to mid-2005, Lach had not seen any NPS markers on the south side of Stagecoach Road. (Lach Aff. at ¶ 4.) Lach had, however, seen NPS markers and fences on the north side of Stagecoach Road. (*Id.* at ¶ 5.) The markers Lach saw on the north side of Stagecoach Road are approximately 4 inches wide by 3 feet tall, and made of what looks like a plastic composite. (*Id.* at ¶ 6; see also photograph of marker attached as Ex. 1A.) The fences seen by Lach on the north side of Stagecoach Road are made with railroad ties spaced at varying lengths with a metal cable running between the ties. (*Id.* at ¶ 7.) The fence is not continuous, but is intermittently placed, and at some spots is approximately 15-20 feet north of the Stagecoach Road pavement. (*Id.* at ¶ 7.) A small percentage of the railroad ties bear a metal sign containing the words "US BOUNDARY NPS." (*Id.; see also* photograph of fence attached as Ex. 1B.)

In preparing to build his residence at 5525 Stagecoach Road, Lach applied to the City of Portage and obtained a building permit and improvement location permit. (*See* Ex. 1C and 1D.) The improvement location permit mandated, among other things, that a curb and a driveway were required before an occupancy permit would be issued. (Lach Aff. at ¶ 8.) Lach believed that he would have access to Stagecoach Road from his property. (*Id.*) On November

4

17, 2006, the City of Portage issued the certificate of occupancy for Lach's residence at 5525 Stagecoach Road with direct access to Stagecoach Road. (Lach Aff. at ¶ 10.)

On October 11, 2005, Ewen received written notice from the NPS that it owned a portion of the land south of Stagecoach Road between the 35.17 acres and the road, and that it disputed the Ewens' access to Stagecoach Road over the land. (Ewen Aff. at ¶ 9.) Lach learned from Ewen on October 11, 2005, that there was a problem with the NPS allowing access to Stagecoach Road from Lach's property. (Lach Aff. at ¶ 11.) Until that point, Ewen and Plaintiffs had believed that the northern property line ran all the way to Stagecoach Road. (Ewen Aff. at ¶ 4; Compl. at ¶ 24.) In their complaint, the Lachs ask the Court to "[d]eclare that the Plaintiffs' [stet.] have unlimited and direct access to Stagecoach Road from their property located at 5525 Stagecoach Road," and that they "be allowed to have their driveway remain in its current position connecting their residence to Stagecoach Road." (Compl. ¶ 26.)

In the instant motion, the Government argues that Plaintiffs' claim is barred by the 12 year limitations period set forth in section 2409a(g). Specifically, the Government argues that the 12 year time limitation began tolling at one of two times. The first time, argues the Government, was in January 1978, when Defendant took title to Tract 09-102, the land immediately north of the 35.17

5

acres currently owned by the Lachs. (Mem. In Supp. Of Rule 12(b)(1) Mot. To Dismiss, pp. 7-8.) The Government urges that the recording of the deed to that land "was notice to the world of the United States' claim of ownership." (*Id.* at 7.) Alternatively, the Government argues that the NPS's surveyors marking in 1981 of the boundary between Tract 09-102 and the 35.17 acres also constituted notice of ownership and started the running of the 12-year statute of limitations. (*Id.* at 7-8.)

In response, the Lachs argue that the 12-year statute of limitations did not begin running until October 11, 2005, when Ewen received written notice from the NPS that it owned a portion of the land south of Stagecoach Road, between the 35.17 acres and the road, and disputed giving him and Lach access to the road over that land. The Lachs attempt to distinguish the Government's main case, *Tadlock v. United States*, 774 F. Supp. 1035 (S.D. Miss. 1990) (in which the plaintiffs claimed title to the land itself), by arguing that Plaintiffs are only seeking the use of a small strip of land owned by the NPS over which they must travel to gain access to Stagecoach Road, or merely a non-possessory interest. This difference between a possessory interest and a non-possessory interest is crucial in deciding the statute of limitations issue, claim the Lachs.

DISCUSSION

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss claims over which the federal court lacks subject matter jurisdiction. Jurisdiction is the "power to decide" and must be conferred upon a federal court. *In re Chicago, Rock Island & Pac. R.R. Co.*, 794 F.2d 1182, 1188 (7th Cir. 1986). When jurisdictional allegations are questioned, the plaintiff has the burden of proving that the jurisdiction requirements have been met. *Kontos v. United States Dep't of Labor*, 826 F.2d 573, 576 (7th Cir. 1987). In reviewing a Rule 12(b)(1) motion to dismiss, the Court may look beyond the complaint and review any extraneous evidence submitted by the parties to determine whether subject matter jurisdiction exists. *United Transp. Union v. Gateway Western R.R. Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996).

The Quiet Title Act ("QTA") waives sovereign immunity to suits against the United States "to adjudicate title disputes involving real property in which the United States claims an interest." *Block v. North Dakota*, 461 U.S. 273, 275-76 (1983). "Because the QTA waives the government's sovereign immunity from suit, a plaintiff must comply with the limitations period to effectuate that waiver. Hence the QTA statute of limitations acts as a jurisdictional bar unlike most statutes of limitations, which are affirmative defenses." *Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 737-38 (8th Cir. 2001) (citing *Block*, 461 U.S. at 275-76). An action under section 2409 of the QTA must be brought within 12

years of the date upon which it accrued.  28 U.S.C. § 2409a.  Such an action accrues "on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."  *Id.* at 737 (quoting 28 U.S.C. § 2409a(g)).

The Government argues that the Lachs' action is barred because they knew or should have known of the United States' claim to the land when the United States took title and recorded the deed in 1978, or at the latest, when the NPS conducted its survey and demarcated the boundary in 1981.  In support of this position, the Government cites to *Tadlock v. United States*, 774 F. Supp. 1035 (S.D. Miss. 1990).  In that case, the United States acquired title to a parcel of land in 1935 from a lumber company.  *Id.* at 1037. When the Government posted its boundary signs beyond a fence which was historically accepted by the lumber company and plaintiffs as the property line, the plaintiffs argued that they acquired title up to the fence by adverse possession against the lumber company prior to 1935.  Plaintiffs filed a quiet title action in 1989. They argued that they deserved title because plaintiffs and their predecessors farmed the land on their side of the fence, ran cattle on it, and sold timber off of it.  *Id.* at 1038.  Among other arguments, the United States contended that the plaintiffs failed to file their claim within the 12 year period provided by section 2409a(g).  *Id.* at 1043.  In response, Plaintiffs contended they did not have actual notice of the United States' claim until 1989,

following the commencement of the drilling of an oil well on the disputed land. *Id.* The Court found that plaintiffs did indeed have prior notice of the United States' interest in the land, including the 1935 acquisition of the land, surveys in 1940 and 1946 in which section corners were re-monumented, the recordation of the deed, and evidence of a failed agreement between the parties in 1953 regarding the conveyance of the disputed land to plaintiffs. *Id.* at 1043-44. Thus, the *Tadlock* plaintiffs' claims were barred for failure to commence the action within 12 years of their notice.

Here, Plaintiffs distinguish *Tadlock* on the basis of the nature of the disputed right. In *Tadlock*, plaintiffs were claiming title to the land itself, or, as Plaintiffs characterize it, a possessory interest. In contrast, the Lachs allege that they are only claiming a continued use over the small strip of land owned by the NPS over which they must travel to gain access to Stagecoach Road (the driveway), which they characterize as a non-possessory interest. (Pls.' Resp., p. 8.)

Plaintiffs cite to a different line of cases, which they say control the present situation. *See Werner v. United States*, 9 F.3d 1514 (11th Cir. 1993), *Michel v. United States*, 65 F.3d 130 (9th Cir. 1995), and *Burlison v. United States*, No. 04-2597 M1/P, 2005

9

WL 1420879 (W.D. Tenn. June 14, 2005).[1]  Each one will be addressed *in seriatim*.

In *Werner*, owners of property that was bordered on three sides by water and on a fourth side by an Air Force base brought action under the QTA for an easement by necessity to use the road crossing the base.  The government argued that the plaintiffs and their predecessors in title knew or should have known of government ownership or interest for more than 12 years, so summary judgment was granted.  But the Sixth Circuit found that the issue was "misperceive[d]".  *Werner*, 9 F.3d at 1516.  Plaintiffs never disputed the government's ownership, nor did they deny that they knew the government was the owner of the land between their property and the road.  Thus, the Court described the limitations issue as turning:

> [U]pon whether, prior to the erection of the gate, plaintiffs or others had been permitted to utilize the road for access to plaintiffs' property and, if plaintiffs or others had been so permitted, when did plaintiffs know, or should have known, that the government had changed its position and, adversely to the interests of plaintiffs, denied or limited the use of the roadway for access to plaintiffs' property.

*Id.* at 1516.

The *Werner* Court then turned to other applicable cases for

---

[1] The Court notes that neither party has cited to controlling Seventh Circuit law for the interpretation of this issue with section 2409a(g), and after conducting an independent search, this Court is not aware of any either.  Thus, this Court must look to the law created by other circuits.

illumination.  In *Park County, Montana v. United States*, 626 F.2d 718 (9th Cir. 1980), Plaintiffs, counties of Montana, filed suit in 1976 against the United States under section 2409a(a) to quiet title to an easement across lands of a national forest.  The district court dismissed pursuant to the statute of limitations, but the appellate court disagreed.  In *Park County*, part of the alleged right of way lay in a part of the national forest that was designated as primitive area in 1932.  In 1962, the Forest Service placed a rock barrier and a sign where the existent trail entered the primitive area, prohibiting entry by motor vehicles.  The Court of Appeals agreed that plaintiffs knew or should have known of the claim of the Untied States to the right of way more than 12 years before suit.  However, the appellate court did not measure the start of the limitations period from 1902 (when the Government became owner of the property), or from 1932 (when the relevant part of land was established as a primitive area), but rather from 1962, when the rock barrier and the sign was placed, prohibiting use by motor vehicles.

The *Werner* Court also looked at *Kinscherff v. United States*, 586 F.2d 159 (10th Cir. 1978), which involved a road the United States built on its land to a dam site.  Plaintiffs sued under section 2409 alleging they wanted to develop their adjoining land to which the road was the only access, and the United States refused to let them use the road to bring in equipment, etc.

Although the district court dismissed for failure to state a cause of action under Section 2409a, the Tenth Circuit reversed and remanded, holding whether an easement of necessity existed was a mixed question of law and fact. Regarding the limitations issue, the Court found it started to run when the plaintiffs knew or should have known that the government claimed it could deny their use of the access road to their property.

After reviewing these cases, the *Werner* Court finally rejected the idea that "the notice that triggers the statute of limitations need be only that the government claims some interest - any interest - in the property." *Werner*, 9 F.3d at 1518-19. Rather, the Court held that:

> For statute of limitations purposes, the first inquiry must define the government's claim and then one must look to the time that the government, acting adversely to the interests of others, seeks to expand that claim.

*Id.* at 1519.

The other two main cases relied upon by Plaintiffs are similar to *Werner*. In *Michel v. United States*, 65 F.3d 130 (10th Cir. 1995), plaintiffs owned property that shared common borders with a national wildlife refuge. The plaintiffs used the roads and trails across the refuge to conduct their cattle and farming business. Since 1960, plaintiffs and the United States engaged in negotiations and disputes over plaintiffs' right of access to roads and trails across the refuge. In 1992, plaintiffs filed suit to

12

quiet title to access routes across the refuge. Although the district court dismissed on the ground that the claim was barred by the 12-year statute of limitations, the Tenth Circuit reversed finding:

> [W]hen the plaintiff claims a non-possessory interest such as an easement, knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim. A plaintiff's cause of action for an easement across government land only accrues when the government, 'adversely to the interests of plaintiffs, denies or limits the use of the roadway for access to plaintiffs' property.'

*Michel*, 65 F.3d at 132 (citing *Werner*, 9 F.3d at 1516). The reasoning is as follows:

> A contrary holding would lead to premature, and often unnecessary, suits. If a government claim to title were sufficient to trigger the running of the limitations period on any claim affecting use of the property, a claimant of a right of access would be forced to bring suit within twelve years even though the government gave no indication that it contested the claimant's right. The claimant would be compelled to sue to protect against the possibility, however remote, that the government might someday restrict the claimant's access. The statute should not be read to create such an undesirable result.

*Michel*, 65 F.3d at 132.

The third main case relied upon by Plaintiffs is *Burlison v. United States of America*, No. 04-2597 M1/P, 2005 WL 1420879 (W.D. Tenn. June 14, 2005).[2] In *Burlison*, plaintiff brought the action

---

[2]This case was ultimately affirmed in part and reversed in part by *Burlison v. United States*, 533 F.2d 419 (6th Cir. 2008),

under section 2409 to quiet title to a purported easement over part of a national wildlife refuge. Defendant moved to dismiss based upon the statute of limitations, claiming the cause of action accrued in 1991 when the United States' claim in the access road was purportedly set forth in special use permits accepted by Plaintiffs' predecessors. However, the Court found that the existence of a special use permit does not necessarily indicate the Government's contestation of the existence of an easement. Moreover, because the Plaintiff contended they were not aware that the Government was asserting a right to exclude plaintiffs from the property until 2002, within the 12-year filing period, there existed genuine issues of material fact regarding whether the complaint was timely filed, and the motion to dismiss was therefore denied. *Id.* at *1.

In the present case, Plaintiffs strongly urge that they are <u>not</u> claiming a title interest in the disputed land, but are rather claiming use of the strip of land owned by the NPS over which they must travel to gain access from their property to Stagecoach Road. At first, this Court was "thrown off the trail," as was the Government, by the fact that the complaint states it is an action "to quiet title to certain real property." (Compl. ¶ 1; Reply of

---

finding the plaintiffs did have a common-law right to traverse the field-access road, but that the Fish and Wildlife Service could impose reasonable regulations on the use of plaintiffs' common-law easement.

14

United States to Resp. Of Pls.' Mot. To Dismiss, p. 1.) However, close inspection of the complaint leads the Court to accept this statement repeatedly urged by the Plaintiffs. The complaint alleges that "[f]or a period of time beginning in the 1940s, Charles Ewen, first as tenant and then as owner, and his predecessors, had uninterrupted and unlimited direct access to Stagecoach Road from all points along the northern property line of the 35.17 acres." (Compl. ¶ 18.) Additionally, "through usage and the understanding of the six owners and Inland Steel Company, rights ripened by adverse possession . . . for uninterrupted and unlimited access to Stagecoach Road . . ." (Compl. ¶ 19.) Plaintiffs "believe[d] that they had uninterrupted and unlimited access to Stagecoach Road" (Compl. ¶ 22) and first learned of the United States "contesting the Plaintiffs' right to have direct access to Stagecoach Road" on October 11, 2005, after receipt of the letter. (Compl. ¶¶ 23, 24.) The complaint is couched in terms of Plaintiffs' access to Stagecoach Road, and not a demand for actual title to a portion of Tract 09-102. Rather, the complaint does make clear that Plaintiffs believed they had uninterrupted and unlimited access to Stagecoach Road, and when they found out in 2005 that the Government claimed absolute title to the land upon which the driveway was constructed, they filed the instant complaint requesting that the Court "[d]eclare that the Plaintiffs have unlimited and direct access to Stagecoach Road" and

"be allowed to have their driveway remain in its current position." (Compl. ¶ 26.)

The fact that Plaintiffs are not claiming a possessory interest does distinguish this case from *Tadlock*, in which the plaintiffs sought actual title over a disputed tract of land. *Tadlock*, 774 F. Supp. at 1044. Ownership of Tract 09-102 is not really an issue in this case - Lach and his predecessors certainly knew that the NPS owned Tract 09-102 and the land north of Stagecoach Road; however, they were mistaken as to the southern boundary of Tract 09-102. Up until Plaintiffs learned about the NPS letter in 2005, both Ewen and Plaintiffs allegedly believed that their northern property line ran all the way to Stagecoach Road. (Ewen Aff. at ¶ 4; Compl. at ¶ 24.) In other words, taking their pleadings as true at this stage in the proceedings, as this Court must, Plaintiffs did not know that the NPS owned any of the land south of Stagecoach Road, and Plaintiffs believed they had access to Stagecoach Road because they owned the land the driveway was on.

This differs from the circumstances in the other easement interest cases. For example, in *Werner*, the plaintiffs admitted that they knew the Government owned the land between their property and the road. *Werner*, 9 F.3d at 1515. Similarly, in *Michel*, the plaintiffs knew the Government claimed title to the land. *Michel*, 65 F.3d at 131. Of course, on the flipside, this case is similar

to *Werner*, *Michel*, and *Burlison* in that Plaintiffs did not know that the NPS was asserting its right to exclude Plaintiffs from its property until 2005, which was within the statute of limitations period.

Another difference between these easement interest cases and the present one, as the Government has pointed out, is that *Werner* and the cases cited within dealt with plaintiffs who had a historic use of the Government's property. Similarly, in *Michel*, the plaintiffs historically used the roads and trails across the wildlife refuge. *Michel*, 65 F.3d at 131. Although the construction of the driveway in this case is new, the Court notes that there has been some historic use here as well (albeit a different kind), because Ewen had farmed and maintained all of the land in his 35.17 acres (including up to the southern edge of Stagecoach Road) and Ewen used the land to access Stagecoach Road at various points. (Ewen Aff. at ¶ 7.) Nevertheless, the Government claims this intermittent use is insufficient, and the driveway is a new burden to its land.

Upon balancing, the Court believes this line of case law (*Werner*, *Michel*, and *Burlison*) is factually similar enough to be instructive here. What links all of these cases, including the instant one, together is the fact that the parties are not claiming possession of the disputed land, but rather an easement over it. The Lachs are not seeking title of the land, but instead an

17

easement for their continued use of the driveway connecting them to Stagecoach Road. This commonality is enough to follow the holding that:

> [W]hen the plaintiff claims a non-possessory interest such as an easement, knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim. A plaintiff's cause of action for an easement across government land only accrues when the government, 'adversely to the interests of plaintiffs, denies or limits the use of the roadway for access to plaintiffs' property.'

*Michel*, 65 F.3d at 132 (citing Werner, 9 F.3d at 1516).

Thus, the Court finds that the statute of limitations in this case did not start running in 1978 when the NPS acquired ownership to Tract 09-102, or in 1981 when the surveyors allegedly placed markers along the boundary of Tract 09-102, because these acts merely placed the Lachs and/or their predecessors on notice that NPS claimed ownership of Tract 09-102. Rather, the statute of limitations began running in 2005 when Plaintiffs received notice from the NPS that the NPS was disputing the Lachs' use of the driveway across NPS land.

In its reply memorandum, the Government argues at length that this case should be dismissed because the Lachs will not be able to establish an implied or prescriptive easement over the NPS land. This is off course from the Government's initial Rule 12(b)(1) motion to dismiss in which it argued that the Court lacked jurisdiction because Plaintiffs' complaint was not filed within the

12-year statute of limitations prescribed by section 2409a(g). This argument (whether an easement is proper) may ultimately go to the merits of this case, and may be advanced in a motion for summary judgment should the Government so choose, but it is not relevant to the task at hand, which is whether this Court has subject matter jurisdiction.

CONCLUSION

For the reasons set forth above, the Rule 12(b)(1) Motion to Dismiss is **DENIED**.


DATED: May 26, 2009                /s/RUDY LOZANO, Judge
                                   United States District Court